IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SONIA A. CHARLTON,            )
                              )
           Plaintiff,         )
                              )
    v.                        )
                              )  Civil Action No: 04-929-KAJ
JOANNE B. BARNHART,           )
COMMISSIONER OF SOCIAL        )
SECURITY,                     )
                              )
           Defendant.         )

---

**MEMORANDUM OPINION**

---

Gary C. Linarducci, Esq., 910 West Basin Road, Suite 200, New Castle, Delaware 19720, Counsel for Plaintiff

Patricia C. Hannigan, Esq., United States Attorney; Colm F. Connolly, Esq., United States Attorney; The Nemours Building, 1007 Orange Street, Suite 700, P.O. Box 2046, Wilmington, Delaware 19899-2046, Counsel for Defendant
    Of Counsel: David F. Chermol, Esq., Special Assistant United States Attorney; Donna L. Calvert, Esq., Regional Chief Counsel; Office of General Counsel, Social Security Administration, P.O. Box 41777, Philadelphia, Pennsylvania 19101.

---

November 8, 2005
Wilmington, Delaware



JORDAN, District Judge

I. **INTRODUCTION**

Before me is a motion for summary judgment (Docket Item ["D.I."] 10) brought by plaintiff, Sonia A. Charlton ("Charlton"), and a cross-motion for summary judgment (D.I. 14) brought by defendant, Commissioner of Social Security ("Commissioner"). Charlton brings this action under 42 U.S.C. § 405(g), seeking review of the Commissioner's final decision denying her disability benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-34. Jurisdiction is proper under 28 U.S.C. § 1331 and 42 U.S.C. § 405(g). For the reasons set forth, Charlton's motion for summary judgement (D.I. 10) will be granted to the limited extent that the decision of the Commissioner will be vacated. The Commissioner's motion for summary judgment (D.I. 14) will be denied, and this matter will be remanded.[1]

II. **BACKGROUND**

A. Procedural History

On January 31, 2002, Charlton applied for disability benefits, alleging that she has been disabled since April of 2001. (D.I. 11 at 1; D.I. 14 at 1.) After her application was denied initially and upon reconsideration, Charlton then filed a request for a hearing before an administrative law judge ("ALJ"), which was subsequently held on July 10, 2003. (Id.) At the hearing, she was represented by counsel and testified on her own behalf, along with a vocational expert. (D.I. 14 at 1.) On September 26, 2003,

---

[1] I remand this matter for development of the record. I am not to decide disputed facts and require only that the ALJ's decision be adequately explained and supported by substantial evidence.

the ALJ concluded that Charlton was not disabled within the meaning of the Act. (D.I. 7 at 29.)

Charlton then appealed the ALJ's decision to the Appeals Council of Social Security. (*Id.* at 9.) On July 20, 2004, the Appeals Council "found no reason . . . to review the [ALJ's] decision," thereby denying Charlton's request (*Id.* at 5.) Therefore, the September 26, 2003 decision of the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981, 422.210; *see also Sims v. Apfel*, 530 U.S. 103, 106-07 (2000) (noting that, if Appeals Council denies request for review, ALJ's decision becomes Commissioner's final decision); *Matthew v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001) (same). Charlton now seeks review by this Court under 42 U.S.C. § 405(g). (D.I. 11 at 4.)

Charlton was fifty-three years old on the date of the ALJ's decision on September 26, 2003. (D.I. 7 at 37.) She has a high school education and two years of college. (*Id.*) She also has past relevant work experience as a systems analyst and an insurance claims processor. (*Id.* at 37, 78) Charlton alleges that, as of April 26, 2001, she became disabled due to carpal tunnel surgery. (*Id.* at 33; D.I. 11 at 1.) In addition, on March 10, 2002, she was involved in a motor vehicle accident where she claimed she sustained permanent injuries.[2] (D.I. 7 at 60.) Her alleged injuries include

---

[2]The Commissioner's Reply Brief referred to the transcript and stated that Charlton's attorney amended the alleged onset date from April 26, 2001 to March 10, 2002. (D.I. 14 at 1.) In the transcript, Charlton's attorney had noted that the ALJ *may* use the date of her accident as the alleged onset date because that was when Charlton's impairment worsened. (D.I. 7 at 85.) However, it appears that the ALJ regarded April 26, 2001 as the alleged onset date and evaluated the evidence as such. (*See id.* at 33.)

anxiety/depression, allergic rhinitis, asthma, bilateral carpal tunnel syndrome, degenerative disc disease, rotator cuff tear, and right lateral epicondylitis. (D.I. 11 at 3.)

1. Medical Evidence

In February of 2000, Charlton underwent surgery at First State Orthopaedics P.A. ("First State") for the rotator cuff tear in her right shoulder. (D.I. 7 at 210.) After the surgery, a First State physician Dr. Evan Crain, found that she was healing well and discharged her later in October of 2000. (*Id.* at 203.) In February of 2001, she returned to Dr. Crain for evaluation of her wrists and complained that she had developed numbness in her wrists through "a lot of keying at work." (*Id.* at 202.) Dr. Crain performed a surgical procedure called "carpal tunnel release" on her right arm on May 1, 2001 and on her left arm on July 19, 2001. (*Id.* at 197, 200.)

Dr. Crain examined her in October 2001 and found mild residual swelling along the left carpal tunnel incision. (*Id.* at 194.) Charlton said that, because she was making progress, she wanted to continue physical therapy but was concerned that she was being pushed too quickly. (*Id.*) Dr. Crain, however, believed that she was progressing and recovering nicely. (*Id.*) To address her concerns, Dr. Crain provided the name of another doctor for her to obtain a second opinion, but she was not interested. (*Id.*) Toward the end of November 2001, Dr. Crain noted improvement in both of Charlton's hands, with the occasional ache and stiffness in her fingers. (*Id.* at 193.) He noted that she had already completed hand therapy, and he returned her to full duty work, recommending that she avoid repetitive use of her hands. (*Id.*) On December 24, 2001, Dr. Crain allowed her to return to work without restrictions and noted that she was

totally disabled immediately following her surgeries and partially disabled from October 3, 2001 to December 23, 2001. (*Id.* at 234.) Furthermore, a therapist with Hand Therapy of Delaware, P.A. saw her and reported significant improvement in hypersensitivity of a surgical incision but slightly limited range of motion. (*Id.*)

At her January 2002 visit with Dr. Crain, Charlton complained of a burning sensation in her left hand due to increased activity–mainly, work around the house. (*Id.* at 193.) She stated that she felt a ripping sensation along the carpal tunnel region, but Dr. Crain found that she was doing fine neurologically and had full motion of her fingers. (*Id.*) He noted that she had to give it time and continue increasing her activities. (*Id.*) A month later, Dr. Crain stated that Charlton had shown "definite" improvement after her carpel tunnel surgeries. (*Id.* at 378.) Despite her complaints, Dr. Crain noted good prognosis of recovery and recommended an increase in activities. (*Id.*) He admitted that her improvement was slower than expected, but she was released to return to work without repetitive use of both hands. (*Id.*)

Dr. Mauriello, an orthopaedic surgeon, evaluated Charlton in March 2002 and stated that her activities included driving, maintaining hygiene, feeding herself, and packing and moving. (*Id.* at 336.) He found that the numbness, tingling, and pain in her hand had decreased between 40-60% with surgery and that the symptoms occurred a few times a week instead of everyday. (*Id.* at 337.) After Dr. Mauriello performed a physical examination and reviewed medical records, he determined that Charlton was capable of full-time work after her left carpal tunnel release in July of 2001. (*Id.* at 340.) He noted, however, that she would have been limited in her left hand until the end of

2001. (*Id.*) He concluded that she was able to continue working full time without repetitive use of both hands, that she could not return to her keypunching job but could, for instance, answer the phone, check appointments, and direct activities. (*Id.*)

On March 10, 2002, she was involved in a car accident and was sent to the Wilmington Hospital Emergency Room for treatment of injuries to her neck and right hip. (*Id.* at 247.) Then, she sought treatment at First State for her injuries. (*Id.* at 189.) She complained primarily of neck discomfort, pain radiating from her right shoulder down to her arm, and swelling in her right forearm. (*Id.*) Dr. Crain's impression was that Charlton sustained a contusion to her forearm and a strain and sprain of her shoulder and neck. (*Id.*) An MRI revealed minimal central disc protrusion at C2-3 and C3-4. (*Id.* at 175.) Dr. Crain observed that the accident "really affected her right side" but found good range of motion in her fingers, wrist, elbow, and shoulder. (*Id.* at 188.) He noted that she was improving with chiropractic treatment and rehabilitation therapy under direction of a Dr. Craig Sternberg. (*Id.*)

Dr. Sternberg treated Charlton at Delaware Back Pain & Sports Rehabilitation Centers. (*Id.* at 269.) When she saw Dr. Sternberg, Charlton complained of neck pain that she characterized as achy and constant, more as a "hurting type of sensation" rather than sharp pain. (*Id.*) She also stated that the symptoms were more on her right side than the left and that she did not feel any pain radiating into the upper extremities, nor any numbness or weakness. (*Id.*) Dr. Sternberg's impressions were that she had neck pain with cervical strain and sprain and right trapezuis strain and sprain. (*Id.* at 271.) A month later in April of 2002, Dr. Sternberg noted that Charlton had made some

nice improvement with the rehabilitation program. (*Id.* at 264.) She complained of increased pain going down her right arm after she attempted to take medication less often. (*Id.*) An electrodiagnostic evaluation showed evidence of a right C6 radiculopathy, but the findings were considered mild in nature. (*Id.* at 259-60.) Moreover, at about the same time, Dr. R.K. Swami, who evaluated Charlton for the Office of Disability, observed that she had chronic pain but was able to perform housework. (*Id.* at 285.)

Charlton had Physical Residual Functional Capacity Assessments in March 2002 and May 2002, which stated that she can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, and stand, walk and sit for about 6 hours in an 8-hour workday. (*Id.* at 276, 289.) However, the May 2002 assessment also noted that she was limited in her upper extremities with respect to pushing and pulling and that, more specifically, she was to avoid continuous use or repetitive tasks with those extremities but could do frequent pushing and pulling. (*Id.* at 289.)

Charlton continued to see Dr. Sternberg for treatment of her neck pain. (*Id.* at 365.) Dr. Sternberg noted that her neck pain was at a medium level of discomfort and at irregular intensity. (*Id.*) She complained of the same neck pain that radiated to her right hand and of swelling in her right hand. (*Id.* at 356.) She also mentioned that her symptoms worsen with increased activity. (*Id.* at 356, 365.) Dr. Sternberg recommended she cease work until July of 2002. (*Id.* at 357, 364.) Furthermore, in June of 2002, Dr. Crain noticed forearm swelling, mostly in the right wrist. (*Id.* at 375.) He also observed that she had full range of motion of the wrist and fingers and

described her shoulder pain as mild. (*Id.*) He recommended that she continue with conservative treatment under Dr. Sternberg. (*Id.*)

In September of 2002, Charlton saw Dr. Sternberg with the same complaints plus a concern about a lump she had noticed in her neck. (*Id.* at 352.) A shoulder arthrogram showed the repair of the rotator cuff. (*Id.* at 376.) An MRI dated October 2002 revealed impressions of cervical spondylosis and straightening with diffuse disc desiccation from C2 through C7 and central disc bulges and herniations present from C2 through T1 currently touching only the anterior surface of the cord. (*Id.* at 349.)

At the end of 2002, Dr. Bruce Katz of First State ruled out disc herniation and noted arm pain radiation into her forearm to the thumb and forefinger in a mostly C6 dermatomal distribution. (*Id.* at 370.) At a follow up evaluation with Dr. Sternberg in December 2002, Charlton complained of the same pain in her neck but rated it at 6 out of 10. (*Id.* at 350.) Range of motion of the cervical spine was tender, and the functional range of motion of the upper extremities was intact. (*Id.*) She also underwent a right C6 selective nerve root block performed by Dr. Yadhati, which gave her good relief of her arm symptoms. (*Id.* at 373.)

A residual functional capacity evaluation performed by Dr. Sternberg in January of 2003 stated that Charlton can carry or lift 10 pounds occasionally and frequently and sit, stand, or walk for 8 hours of an 8-hour workday. (*Id.* at 383.) It also noted that she suffered from moderate pain and, on occasion (about 5 days out of a month), suffered from severe pain. (*Id.*) The form also stated that the pain only mildly affected her ability to concentrate at work and complete a day's workload. (*Id.*) Moreover,

according to the evaluation, at a job requiring sedentary work, she would be expected to be absent for 3 days every month. (*Id.*)

In February of 2003, during an evaluation by Dr. Katz of First State, Charlton complained of right arm pain but denied any neck pain. (*Id.* at 399.) An ENMG study of her right arm revealed no definite electrodiagnostic abnormality. (*Id.* at 391.) At the end of the month, she underwent selective nerve root block right C6 with a dramatic improvement in her right arm pain. (*Id.* at 399.) It was noted that she was still not working although she rated her pain 3 out of 10 and denied weakness in her upper extremities. (*Id.*) MRI revealed only a bulge at the C5-6 level. (*Id.*)

She saw Dr. Crain again in April of 2003 for an evaluation of pain in her right elbow. (*Id.* at 396.) She was also contemplating neck surgery, as she had neck and radicular pain. (*Id.*) Upon examination, Dr. Crain found tenderness of the right elbow, pain radiating along the brachioradialus, and pain with resistance testing and stretching, but he also found full range of motion. (*Id.*) X-rays of the elbow showed slight calcification along the medial and lateral epicondyle but no evidence of joint space narrowing. (*Id.*) Dr. Crain concluded that Charlton's symptoms were due to lateral epicondylitis. (*Id.*) On July 9, 2003, a cervical myelogram followed by a CT scan showed small central herniations at C2 down to C5 and straightening of the cervical lordosis with mild anterior spondylosis from C4 down to C7. (*Id.* at 395.)

As to her mental condition, a Psychiatric Review Form filled out by Dr. Pedro Ferreira in April 2001 noted that Dr. Neil Kaye had diagnosed Charlton as having suffered from major depression in February of 1998. (*Id.* at 308.) Dr. Ferreira found

that her mental disorder caused mild restrictions of activities of daily living and mild difficulties in maintaining social functioning. (*Id.* at 315, 318-19.) However, difficulties in maintaining concentration, persistence, or pace were moderate, and her mental condition would not preclude her from substantial gainful activity. (*Id.* at 315, 320.) Charlton had been visiting Dr. Kaye since February of 1998 with the exception of January 2001 through June of 2002. (*Id.* at 151-66, 321.) A Delaware Disability Determination Service form dated July 2002 stated that she did not allege limited ability to work as a result of her mental illness. (*Id.* at 321.) A Mental Residual Functional Capacity Assessment performed in July of 2002 stated that Charlton's understanding, memory, sustained concentration, and persistence were not significantly limited except that her ability to maintain attention and concentration for extended periods was moderately limited. (*Id.* at 318.) Her social interaction was not significantly limited overall, but she was moderately limited in her ability to interact appropriately with the general public and in her ability to accept instructions and criticism. (*Id.* at 319.) Her ability to adapt was also not significantly limited except in her ability to set realistic goals and make plans independently of others. (*Id.* at 319.)

As to her allergies and asthma, in February of 2002, Charlton sought treatment with Dr. Gregory Marcotte of Asthma & Allergy Care of Delaware, P.A. because her rhinitis symptoms and sinusitis had returned. (*Id.* at 218.) She also complained of symptoms such as shortness of breath, wheezing, coughing, and chest tightness, which were worsened by exercise and upper respiratory tract infections. (*Id.*) Allergy tests showed that she had sensitivity to grasses, weeds, trees, dust mite, and cats. (*Id.*) She

had been receiving allergy shots for many years and experienced improvement as a result. (*Id.*) In July 2002, Dr. Marcotte found that her rhinitis and asthma did not affect her ability to perform work related physical activities. (*Id.* at 215.) He found that her asthma symptoms seemed well-controlled. (*Id.*)

    2.    <u>ALJ's Decision</u>

To determine whether a claimant is entitled to social security disability benefits, an ALJ applies a sequential five-step inquiry pursuant to 20 C.F.R. § 404.1520. *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000) (establishing five steps); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986) (same).

> Under that five step analysis, the [ALJ] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he will be found not disabled regardless of the medical findings. If an individual is found not to be engaged in substantial gainful activity, the [ALJ] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. If the [ALJ] determines that the claimant suffers from a severe impairment, the [ALJ] will next determine whether the impairment meets or equals a list of impairments in Appendix 1 of sub-part P of Regulations No. 4 of the Code of Regulations. If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [ALJ] must determine if the individual is capable of performing his past relevant work considering his severe impairment. If the [ALJ] determines that the individual is not capable of performing his past relevant work, then she must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy.

*Brewster*, 786 F.2d at 583-84 (internal citations omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

In this case, after applying the five-step evaluation, the ALJ concluded that Charlton is not disabled as defined in the Social Security Act. (D.I. 7 at 33.) The ALJ

first determined that Charlton had not engaged in substantial gainful activity since the alleged onset of her disability. (*Id.*) Next, the ALJ found that her depression/anxiety, allergies, and asthma were not severe impairments and required no further evaluation. (*Id.*) Then the ALJ determined that, although her carpal tunnel syndrome, degenerative disc disease, rotator cuff tear, and right lateral epicondylitis are severe impairments, they are not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (*Id.* at 34.) Then, the ALJ evaluated her residual functional capacity[3] to determine whether she was able to return to her past relevant work. (*Id.* at 34.) After reviewing all medical evidence and considering all of her symptoms, including pain, the ALJ found that Charlton was not capable of performing her past relevant work as a systems analyst and claims processor due to her hand impairments. (*Id.* at 37.)

Last, to determine whether Charlton was capable of other work that existed in the national economy, the ALJ viewed Charlton's age, education, physical ability, and work experience in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations ("grid rules"). (*Id.*) According to the grid rules, a claimant, aged 50-54 with a high school education, two years of college, semi-skilled work experience, and the residual functional capacity of light work, is not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Tbl. 2, R. 202.14. The ALJ also referred to a vocational expert to determine whether additional exertional and/or non-exertional limitations

---

[3]The ALJ defined "residual functional capacity" as "the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks." (D.I. 7 at 34 (paraphrasing definition from 20 C.F.R. § 404.1545 and Social Security Ruling 96-8p).)

would impede Charlton's ability to perform all or substantially all of the requirements of light work. (D.I. 7 at 38.) Based on testimony from the vocational expert, the ALJ determined that Charlton "retains the capacity for work that exists in significant numbers in the national economy." (*Id.* at 39.) The ALJ, therefore, found that Charlton was not disabled within the meaning of the Social Security Act. (*Id.*)

### III. STANDARD OF REVIEW

Judicial review of the denial of an application for Social Security benefits is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *see Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (defining "substantial evidence"). Substantial evidence is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### V. DISCUSSION

Charlton claims that the findings of the ALJ are not supported by substantial evidence. (D.I. 11 at 2.) Specifically, she argues that, in concluding that she was capable of other work in the national economy, the ALJ relied on the vocational expert's testimony that did not include Charlton's age, education, or residual functional capacity. (*Id.* at 2, 18-20.) She also asserts that the ALJ improperly dismissed Dr. Sternberg's assessment of her residual functional capacity. (*Id.* at 2, 21-23.) Furthermore, Charlton argues that the ALJ improperly concluded that her depression/anxiety and asthma were not severe impairments. (*Id.* at 2, 24-26.)

A. <u>Whether the ALJ's determination that Charlton was capable of other work was supported by substantial evidence.</u>

Charlton submits that there is no evidence to support the ALJ's finding that she could perform work that existed in significant numbers in the national economy. (*Id.* at 18-20.) She cites to the ALJ's statement that the hypothetical provided to the vocational expert made reference to Charlton's age, education, and residual functional capacity, but she alleges that the ALJ did not provide a hypothetical or even refer to her vocational profile when questioning the expert. (*Id.* at 20.)

In disability determination proceedings, an ALJ often relies on vocational expert testimony that focuses on one or more hypothetical questions posed by the ALJ. *See, e.g., Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002); *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984); *Stevens v. Barnhart*, 2003 WL 22016922, *7 (E.D. Pa. 2003). The ALJ gives certain assumptions about the claimant's physical capability, usually in the form of a hypothetical, as the basis for the expert to opine on whether the claimant can perform certain types of jobs that exist in the national economy. *Podedworny*, 745 F.2d at 218. Importantly, the hypothetical question posed to the vocational expert must accurately portray the claimant's individual physical and mental impairments. *Burns*, 312 F.3d at 123 (concluding that ALJ's decision was not based on substantial evidence because ALJ relied on vocational expert's response to his deficient hypothetical question).

In this case, the record indicates that the ALJ failed to ask the vocational expert any hypothetical question. (*See* D.I. 7 at 71-85.) In fact, upon review of the record, I cannot say with any sense of confidence that the vocational expert was opining within

-14-

any limitations set by the ALJ.[4] (*See id.*) The expert's testimony regarding other work was provided without any evidence that Charlton's age, education, or functional capacity were considered. (*See id.*) Therefore, the ALJ's decision that Charlton was capable of other work was not based on substantial evidence.

B. <u>Whether the ALJ improperly assessed the evidence.</u>

Charlton argues that the ALJ's conclusion that she retained a residual functional capacity of light work[5] was not supported by substantial evidence. (D.I. 11 at 21-23.) She asserts that the ALJ improperly discounted Dr. Sternberg's finding that she is capable of occasionally lifting no more than 10 pounds. (*Id.* at 22.) The reviewing court usually defers to the ALJ's credibility determinations, but such deference does not extend to decisions without sufficient evidentiary support. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) (stating that ALJ failed to explain discrediting certain evidence and not others). Moreover, the ALJ as the trier of fact has the duty to resolve a situation of conflicting medical evidence. *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (finding that claimant and his personal physician's claim of disability is not

---

[4]In all likelihood, the vocational expert was aware of the limitations and had considered Charlton's vocational profile when testifying, but the record fails to demonstrate this.

[5]Light work is defined as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls.
20 C.F.R. § 404.1567.

substantial evidence "when it stands alone and is opposed by live medical evidence and the client's own contrary personal testimony").

In this case, the ALJ examined the entire record, including medical reports and Charlton's own testimony, to determine her residual functional capacity. (D.I. 7 at 34-37.) Dr. Sternberg's completed residual functional capacity assessment was one element of the entire record that the ALJ considered. (*Id.*) The ALJ did not credit part of Dr. Sternberg's conclusions, i.e., that Charlton could only lift 10 pounds, because that conclusion was inconsistent with the doctor's own statements and other doctors' opinions. (*Id.*) Specifically, the ALJ found that nothing in the record, except Dr. Sternberg's assessment form, reflects that Charlton suffered from any difficulties in lifting. (*Id.* at 36.) The ALJ concluded that the medical reports show quite the contrary: normal strength and function in her bilateral upper extremities; normal range of motion in her neck, shoulders, hands, fingers, wrist, and elbows; and improvement through medication and conservative treatment. (*Id.* at 36-37.) Furthermore, the ALJ noted that, despite Dr. Sternberg's conclusion that Charlton could only lift 10 pounds occasionally and frequently, Dr. Sternberg maintained that Carlton was only mildly limited in her ability to perform a full day's work. (*Id.* at 37, 383.) As such, there is substantial evidence to support the ALJ's determination that Charlton was capable of light work, and deference will be given to the ALJ's credibility determination with regard to Dr. Sternberg's residual function capacity assessment.

Additionally, Charlton contends that the ALJ improperly concluded that her anxiety/depression and asthma were not severe impairments. (D.I. 11 at 24-26.)

Because the second step of the five-step evaluation involves *de minimis* review to screen groundless claims, an impairment is found not severe only if the evidence establishes a slight abnormality that does not significantly limit any "basic work activity." *Newell v. Commissioner of Social Security*, 347 F.3d 541, 546 (3d Cir. 2003) (stating that denial of benefits in step two rarely occurs and, thus, should be closely scrutinized); *see also* 20 C.F.R. § 404.1520(c) (defining severe impairment as one that significantly limits your physical or mental ability to do basic work activities). In this case, the ALJ determined that Charlton's anxiety/depression was not a severe impairment because there was a lack of evidence that her mental disorder limited her ability to work. (D.I. 7 at 34.) In support of this determination, the ALJ referred to Charlton's own admission that her mental problems were only slight and to her psychiatrist's statement that she was stable on medication and experienced no side effects. (*Id.*) Furthermore, Charlton acknowledged that Dr. Ferreira ultimately concluded that her mental disorder would not preclude her from substantial gainful activity. (D.I. 11 at 26.) Nonetheless, she claimed that Dr. Ferreira had "indicated that she would have suffered some limitations as a result of her condition", but she failed to cite where in the record such a statement was made. (*Id.*) I conclude that the ALJ did identify substantial evidence to support his determination that Charlton's anxiety/depression was not a severe impairment.

Charlton argues that her asthma limits her performance of basic work activities because, as indicated by Dr. Marcotte, potential flare-ups of her asthma would cause difficulty in performing basic tasks. (D.I. 11 at 25.) But the ALJ also relied on Dr. Marcotte's opinion in deciding that her asthma was not a severe impairment. (D.I. 7 at 34.) It appears that the ALJ found persuasive Dr. Marcotte's conclusion that her

asthma was controlled with medication and did not affect her ability to perform work. (*Id.*) Dr. Marcotte had stated that Carlton would suffer limitations as a result of a flare-up, but, contrary to Charlton's argument, he did not conclude that she in fact suffered from flare-ups. (*Id.* at 215.) Instead, Dr. Marcotte noted that a flare-up would limit her ability to perform basic tasks "[b]ut her asthma symptoms seem well controlled apparently." (*Id.*) In addition, Charlton admitted that her asthma would not normally affect her ability to work. (D.I. 11 at 25.) The ALJ also referred to her earnings record that demonstrated that she was able to participate in substantial gainful activity despite that condition. (D.I. 7 at 34.) Therefore, the record demonstrates that the ALJ's determination that her asthma was not a severe impairment was supported by substantial evidence.

## V.  **CONCLUSION**

For the reasons stated, Charlton's motion (D.I. 10) will be granted to the extent that the Commissioner's decision will be vacated and remanded for the taking of expert evidence, based on a properly framed hypothetical, to determine whether Charlton can perform work that exists in substantial numbers in the national economy, and the Commissioner's motion (D.I. 14) will be denied. An appropriate order will issue.